## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION
### www.flmb.uscourts.gov

In re:

THE BAY CLUB OF NAPLES, LLC                 Main Case No. 9:20-bk-05008-FMD
THE BAY CLUB OF NAPLES II, LLC              Main Case No. 9:20-bk-05009-FMD
                                            Jointly Administered

            Debtor.

_____/

THE BAY CLUB OF NAPLES, LLC
THE BAY CLUB OF NAPLES II, LLC
PINNACLE ASSET TRUST, LLC derivatively on
behalf of THE BAY CLUB OF NAPLES, LLC and    Adv. Case No. _____
THE BAY CLUB OF NAPLES II, LLC,

            Plaintiffs,

v.

Reliance Standard Life Insurance Company, U.S.
Specialty Insurance Company, Houston Casualty
Company, and Acres Capital, LLC,

            Defendants.

_____/

### <u>ADVERSARY COMPLAINT</u>

Pinnacle Asset Trust, LLC ("Plaintiff") as the sole member for The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC (collectively "Debtors") commence this adversary proceeding as a derivative action against the defendants, Reliance Standard Life Insurance Company ("Reliance"), U.S. Specialty Insurance Company ("U.S. Specialty"), and Houston Casualty Company ("Houston") (collectively, Reliance, U.S. Specialty, and Houston referred to as "Lenders"), and Acres Capital, LLC ("Acres") individually and as administrative agent for Lenders (collectively Acres and Lenders referred to as the "Acres Defendants"). In support of this adversary complaint, Debtors state the following:

1

**JURISDICTION AND VENUE**

1.     This is a civil proceeding involving claims arising under Title 11 of the United States Code, as well as arising in a case under Title 11 of the United States Code, and concern claims administration and liquidation of property of this bankruptcy estate, and the District Court for this federal district has jurisdiction of this proceeding under 28 U.S.C. § 1334(b).

2.     The Court has jurisdiction under 11 U.S.C. §§ 541, 544, 547, 548, and 550 as well as under 28 U.S.C. § 1334.

3.     This adversary proceeding relates to the above-referenced cases under Chapter 11 of the Bankruptcy Code, now pending before the Court. This is a core proceeding under 28 U.S.C. § 157. In the event the Court determines that the lender liability and fraud claims are not a core proceeding, Plaintiff consents to this Court's entry of a final order and/or judgment in this proceeding.

4.     The venue of this proceeding is proper before this Court under 28 U.S.C..§ 1409(a).

**PARTIES**

5.     Pinnacle Asset Trust, LLC is a Florida limited liability company, and is the sole member for The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC. Debtors consent to Plaintiff pursuing the derivative claims alleged in this adversary proceeding because any recovery awarded under those claim benefits Debtors' estate.

6.     The Bay Club of Naples, LLC is a Florida limited liability company and the debtor in the bankruptcy case styled *In re The Bay Club of Naples, LLC*, Case No. 9:20-bk-05008-FMD ("Bay Club Case").

7.     The Bay Club of Naples II, LLC is a Florida limited liability company and the debtor in the bankruptcy case styled *In re The Bay Club of Naples II, LLC*, Case No. 9:20-bk-

05009-FMD ("Bay Club II Case") (collectively Bay Club Case and Bay Club II Case referred to as the "Main Case").

8.     Reliance Standard Life Insurance Company is a corporation organized under Illinois law, and is registered to conduct business in Florida having retained a registered agent for accepting service of process.

9.     U.S. Specialty Insurance Company is a corporation organized under Maryland law, and is registered to conduct business in Florida having retained a registered agent for accepting service of process.

10.     Houston Casualty Company is a corporation organized under Texas law, and is registered to conduct business in Florida having retained a registered agent for accepting service of process.

11.     Acres Capital, LLC is a limited liability company organized under New York law, and is not registered to conduct business in Florida and has not retained a registered agent for accepting service of process. Acres purports to serve as administrative agent for Lenders.

GENERAL ALLEGATIONS

12.     Debtors own two pieces of contiguous real property located in Naples, Florida for developing 2 luxury multi-family residential buildings (the "Project").

13.     When completed, Debtors will sell the individual units within each luxury residential building.

14.     The North Property is currently in the middle of construction and is actively being developed.

15.     Development on the South Property will re-commence through the Debtors Chapter 11 bankruptcies.

16.     On or about June 30, 2016, the Acres Defendants and Debtors entered into an amended and restated loan agreement under which Lenders agreed to fund Debtors to complete the Project ("Loan Agreement"). The Loan Agreement is appended as Exhibit "A".

17.     On or about June 30, 2016, to secure, in part, repayment for the loan, Debtors executed an amended and restated mortgage, assignment of leases and rents, security agreement, and fixture filing ("Mortgage"). The Mortgage is appended as Exhibit "B".

18.     Under Loan Agreement section 2.01, the Acres Defendants agreed to make a loan to Debtors for $28,500,000.

19.     Under Loan Agreement section 2.02, Debtors owed "interest on the maximum principal amount of the Mortgage Loans less amounts repaid at a rate per annum equal to the Applicable Interest Rate."

20.     Section 2.02 defines the Applicable Interest Rate to mean (i) the LIBOR rate plus (ii) 10.50%.

21.     Acres bore the obligation to determine the Applicable Interest Rate for each Interest Period and provide Debtors notice 5 days before the payment due date, which was the first business day of each calendar month.

22.     Under Loan Agreement section 2.02, the Interest Period means the first business day of each calendar month and ends before the first business day of the next calendar month with the interest calculation computed on a year of 360 days.

23.     The first interest payment was due on the Closing Date, July 29, 2016.

24.     In case of a default, any amount of unpaid principal or interest will bear interest from the due date until paid in full at the Default Rate of 24% (Section 2.02 of the Loan Agreement). For any amount that is due but not received within 5 days after payment is due, a Late

Charge of 5% will be applied and payable in addition to the Default Rate and the Applicable Interest Rate (Section 2.07 of the Loan Agreement).

25.     Under Loan Agreement section 2.11, Debtors were to use the loan proceeds "(1) to refinance the Property, (2) to fund each of the Reserves as set forth herein, (3) to pay Project Costs, and (4) to pay expenses incurred in connection with refinancing and the making of the Mortgage Loans."

26.     Reserves include the Interest Reserve, Construction Reserve, and the Soft Cost Reserve.

27.     Under Loan Agreement section 3.03, Debtors must "establish and maintain an interest reserve (the "Interest Reserve") with [Acres] to cover monthly interest payments. . . . [Acres] and Lenders shall credit . . . $3,187,250.00 . . . to the Interest Reserve. [Acres] will deposit the Interest Reserve into a separate account maintained at [Acres] or a Lender, which account may be a subaccount (the "Interest Reserve Account")."

28.     Under Loan Agreement section 3.04, Debtors must "establish and maintain a construction reserve (the "Construction Reserve") with [Acres] to pay expenses associated with the cost of completion of the renovation and construction of the Property. On the date of this Agreement, [Acres] and Lenders shall credit . . . $14,960,680.00 . . . to the Construction Reserve. [Acres] shall deposit the Construction Reserve into a separate account maintained at [Acres] or a Lender, which account may be a subaccount (the "Construction Reserve Account")."

29.     Under Loan Agreement section 3.06, Debtors would "establish and maintain a soft cost reserve (the "Soft Cost Reserve") with [Acres] to pay expenses related to the construction of the Building and insurance coverage during construction, and the costs associated with the architectural/engineering costs and permits. On the date of this Agreement, [Acres] and Lenders shall credit . . . $2,600,000.00 . . . less $545,000.00 [sic] . . . to the Soft Cost Reserve. [Acres] shall

deposit the Soft Cost Reserve into a separate account maintained at [Acres], which account may

be a subaccount ("Soft Cost Reserve Account")."

30.    Under Loan Agreement section 3.07, the Acres Defendants had "exclusive control

over the Reserves . . . No interest shall be paid by [Acres] or any Lender on the Reserves. Funds

in the Reserves may be comingled with other funs [sic] of Administrative Agent or Lenders."

31.    The Loan Agreement does not (a) identify the funds with which the Acres

Defendants may comingle, or (b) indicate whether each of the individual Reserve Accounts would

be in the Debtors' names.

32.    Debtors had requested the Acres Defendants provide an accounting for the funds

purportedly placed in the Reserves.

33.    The loan proceeds paid off 2 existing Acres loans totaling $7,101,698.35, and

should have funded the Reserves as follows:

| | |
|---|---|
| Interest Reserve | $3,187,250 |
| Construction Reserve | $14,960,680 |
| Soft Cost Reserve | $2,600,000 ($2,055,000 disbursed at Closing, leaving $545,000 in the Soft Cost Reserve) |

**Total:  $18,692,930**

34.    The 2 prior loans paid off with the loan proceeds retired $1,432,192.22 in debtor

owed by The Naples Bay Center, LLC, and $5,669,506.13 satisfied in full the debt owed by The

Bay Club of Naples, LLC under the First Mortgage Bridge Loan.

35.    The Loan Agreement included specific terms that vested the Acres Defendants with

control over Debtors.

36.    The Loan Agreement defines "control", "controlling", and "controlled" to mean

"the possession, directly or indirectly, of the power to direct or cause the direction of the

management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."

37.     The Acres Defendants controlled Debtors by prohibiting the following:

Section 15.02. Sale of Assets. Sell, lease, assign, transfer, or otherwise dispose of, any of its now owned or hereafter acquired assets, except for the sale or other disposition of assets no longer used or useful in the conduct of its business.

Section 15.03. Distributions. Declare or make any distribution to any of its members.

Section 15.04. Organizational Documents. Enter into any amendment, modification, waiver, termination or restatement of any Organizational Document.

Section 15.05. Name. Address and Structure. Change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number if it has one without giving Administrative Agent at least thirty (30) days written notice of such change, or change its type of organization, jurisdiction of organization or other legal structure.

Section 15.06. Capital Expenditures. Incur or make any Capital Expenditures other than those required in connection with construction of the Project.

Section 15.07. Litigation. Commence any material litigation. Section 15.07. Litigation. Commence any material litigation.

Section 15.08. Major Property Contracts. Enter into any Major Property Contracts without the consent of Required Lenders.

Section 15.08 [sic]. Property Management Agreement. Amend or modify any of the provisions of the Property Management Agreement.

Section 15.09 [sic]. Issuance of Equity, Issue and additional equity interest, including membership interests.

Section 15.10 [sic]. Leases. Enter into any operating leases or Capital Leases.

38.     While Debtors engaged in the construction process, Acres was slow when processing draw applications Debtors submitted to pay construction and costs from the Reserves.

39.     Delays during construction, including the delays associated with the Acres' draw process, pushed up against the maturity dates for the loan to the Acres Defendants.

40.     Debtors and the Acres Defendants agreed to extend the maturity date for the loan by 6 months, and Debtors paid the Acres Defendants a fee for extending the maturity date.

41.     Construction delays persisted, and Debtors were unable to obtain a refinance before the extended maturity date expired.

42.     Debtors contemplated bankruptcy and went so far as to hire Genovese, Joblove & Battista to serve as debtors' counsel.

43.     As Genovese, Joblove & Battista prepared Debtors for bankruptcy, they discussed the process with the Acres Defendants, who sought to avoid bankruptcy.

44.     The parties started discussions to determine if there was a way to resolve the issues without filing bankruptcy.

45.     During this time, Debtors learned that the Acres Defendants had not funded the Reserves as required under the Loan Agreement.

46.     The funding issue was important to negotiating the stipulated loan amount stated in the Settlement Agreement, which was higher than Debtors believed was appropriate but lower than the full amount the Acres Defendants were claiming.

47.     Debtors together with Harry Zea, as Trustee of the Rohar Trust dated July 12, 2011, and Myles Alpert, both Plaintiff's members, and the Acres Defendants negotiated a settlement, and on May 17, 2019, the parties executed a settlement agreement ("Settlement Agreement").

48.     Debtors and Plaintiff (and others not material to the issues framed under this adversary proceeding) entered into the Settlement Agreement to secure having the Project complete.

49.     The Acres Defendants insisted on removing Mr. Zea from having any role in Debtors; notably, until the parties entered into the Settlement Agreement, Debtors' manager was Pinnacle Project Management, Inc. not Mr. Zea.

50.     The Acres Defendants insisted on having a receiver who would also serve as a chief restricting officer ("CRO") and sole manager for Debtors.

51.     The receiver's duties and obligations under the order appointing the receiver are different from the manager's duties and obligations under Debtors' operating agreement and Florida Statute Chapter 605 and different from the CRO's duties and obligations as a fiduciary.

52.     The Acres Defendants insisted one person fulfill the 3 roles, and thus injected that person into a conflict of interest when attempting to perform the various different duties and obligations for the several different stakeholders.

53.     The Acres Defendants have admitted that they entered the Settlement Agreement to create only one master for the receiver, manager, and CRO to serve – their interests.

54.     The Acres Defendants insisted Debtors amend their respective operating agreements as well as the operating agreement for Plaintiff to divest them of their respective control.

55.     Under the Settlement Agreement, Soneet Kapila ("Kapila") was who the parties selected to serve as the receiver for the property as well as CRO and manager for Debtors:

> <u>Receivership</u>. Kapila shall be appointed as the receiver pursuant to the Receiver Stipulation and together with other duties and responsibilities herein, including as sole manager and chief restructuring officer of the Borrowers, be empowered to undertake the completion of construction of the North Building pursuant to the current approved plans therefor and to maintain that South Building, including to seek to preserve and/or obtain, if possible, any entitlements or permits associated with the South Building. The parties agree to the filing of the previously agreed upon Receiver Stipulation which shall be filed immediately upon the entry of the Order Approving Settlement Agreement, and the parties consent to the submission of the Agreed Order Appointing Receiver to the

Court in the form attached hereto as Exhibit "F" for entry after the Court enters the Order Approving Settlement.

Settlement Agreement ¶ 9.

<u>Sole Manager/Chief Restructuring Officer</u>. This Agreement contemplates that Kapila shall have exclusive control over the Borrowers during the term of this Agreement. Kapila shall be the sole manager and chief restructuring officer for the Borrowers who is empowered take any and all actions on behalf of Borrowers, including, but not limited to, performing all duties under this Agreement, the Agreed Order Appointing Receiver, the Amended and Restated Loan Documents, as modified, and the completion of construction on the North Building. At the Settlement Closing, the operating agreements for each of the Borrowers shall be amended to provide that each Borrower shall be manager controlled and that each borrower shall appoint Kapila as the sole manager with exclusive control over the Borrowers in lieu of Pinnacle Asset Trust LLC until the Receiver is discharged by order of the Court in the Litigation or the parties agree otherwise. The operating agreement for Pinnacle Asset Trust LLC, as sole member of each Borrower, shall not make any changes in respect of the appointment of Kapila as the sole manager or each Borrower absent either an Order of the Court in the Litigation or written consent of ACRES and Kapila.

Settlement Agreement ¶ 10

56.     The Settlement Agreement required the Acres Defendants' loan additional funds to

have Kapila complete the Project:

<u>Additional Advance</u>. Without waiver of the prior maturity and defaults of the Amended and Restated Loan Agreements, ACRES agrees to modify the Amended and Restated Loan Documents in order to make additional funds (the "<u>Additional Advance</u>") available under the construction loan (under the control of Soneet Kapila as the Receiver and CRO) to complete construction of the North Building at an agreed budget up to $6 million, which budget may be adjusted upward at the sole discretion of ACRES. The budget may include costs to construct, carry cost of the new debt, fees for professionals, taxes, insurance and other typical items needed to complete the construction of the North Building consistent with the existing plans, building permit and other approvals in place for the North Building.

Settlement Agreement ¶ 11.

57.    The Settlement Agreement provided for a deadline to close the loan modification

for the additional advance necessary to complete construction for the North Building:

> Closing on Loan Modification. Borrowers and Guarantors shall
> diligently seek to Closing on Loan Modification. Borrowers and
> Guarantors shall diligently seek to obtain the deliverables in
> connection with the closing on the loan modification in order to
> avoid delays in the recommencement of the construction of the
> North Building. The closing on the loan modification shall occur no
> later than 60 days from the date of entry of the Order Approving
> Settlement Agreement ("Loan Closing"). If Borrowers and
> Guarantors are a) not in default of this Agreement, the Amended and
> Restated Loan Agreement or the Order Appointing Receiver; b)
> Borrowers and Guarantors have performed all conditions precedent
> to the Loan Closing; and c) the Loan Closing fails to close for
> reasons beyond the control of Borrowers and Guarantors; then the
> failure to close on the Loan Closing shall not constitute a default of
> this Agreement resulting in the remedies set forth in paragraph 20
> below.

Settlement Agreement ¶ 13.

58.    The Settlement Agreement included a stipulated loan balance totaling $19,500,000

without the additional advance:

> Stipulated Loan Amount Without Additional Advance. As of the
> Settlement Closing, the parties agree that the agreed amount of the
> mortgage debt, including principal, outstanding interest, late charges
> and all amounts due and owing to ACRES/Lenders from Borrowers
> and Guarantors prior to the Additional Advance, is stipulated to be
> $19.5 million (as of the date of Settlement Closing and prior to the
> Additional Advance) for all purposes under this Agreement (the
> "Stipulated Loan Amount") except as otherwise stated.
> Commencing on the Settlement Closing, the Stipulated Loan
> Amount shall accrue interest at the 30-day LIBOR rate plus 8%
> through payoff as provided herein. Upon an event of a noncurable
> default of this Agreement, or an event of default that is not cured as
> provided herein. Upon an event of a noncurable default of this
> Agreement, or an event of default that is not cured as provided
> herein, the compromised amount of the Stipulated Loan Amount
> will be void and ACRES shall be entitled to entry of a judgment and
> collection for the full amount owed, together with default interest
> since the maturity date and all fees, costs, protective advances and
> receiver's certificates. The Stipulated Loan Amount is a settlement
> and accommodation to the Borrower and the Guarantors for strict
> compliance with the terms and conditions set forth in this

Agreement. The Borrowers and Guarantors acknowledge and agree that any federal income tax consequences resulting from payment of the Stipulated Loan Amount are the sole and exclusive responsibility of the Borrowers and Guarantors, that the Borrowers and Guarantors have sought tax advice from their tax professionals and advisors, and that the Borrowers and Guarantors have in no way relief on ACRES with respect to the tax consequences of the Stipulated Loan Amount.

Settlement Agreement ¶ 15.

59.     The Acres Defendants further controlled Debtors by threatening to submit an *ex parte* judgment for an amount that exceeding the stipulated loan amount:

Entry of Final Judgment Upon Default. In the event that the Borrowers or Guarantors breach any of the terms of this this Agreement, then ACRES agrees to and shall send written notice thereof to the Borrowers and Guarantors by email and federal express c/o Paul J. Battista, Esq. or his successor or designee. If the default is curable, the Borrowers and Guarantors shall have a period of two (2) business days after receipt of such notice to cure such default; however, if such is not cured within such two (2) business day period, then ACRES shall be entitled to seek the remedies set forth in this paragraph. Upon the event of a noncurable default or a default that has not been cured within two (2) business days of notice ACRES shall be entitled to submit to the Court an affidavit advising that written notice was given in accordance with the Settlement Agreement and that the event of default was one that was noncurable or that no cure of default was made after notice, together with the calculations of all sums owed for entry of the Final. Judgment. ACRES may submit to the Court ex parte and without further hearing a Stipulated Final Judgment of Foreclosure, Damages on Notes and Guaranty (the "Final Judgment") in a form substantially similar to that attached hereto as Exhibit "H." Borrowers and Guarantors hereby expressly consent to the form of the Final Judgment and consent to the Court entering such Final Judgment ex parte without notice for the full amounts owed pursuant to the Amended and Restated Loan, as modified by the Loan Modification, including all sums sought in the Litigation, together with all sums, default interest, attorneys' fees or costs incurred in accordance with this Agreement. At the time of entry of the Final Judgment, the total sum due to ACRES, as set forth in the Final Judgment, shall include any and all additional sums subsequently advanced by ACRES to protect its collateral, including cost of forced placed insurance, in the event that any sums are advanced by ACRES in order to protect the collateral or for any other purpose as provided in the Amended and Restated Loan, this, or the Agreed Order Appointing Receiver,

> including but not limited to the advancement of monies for insurance, real estate taxes or receiver's certificates, ACRES shall increase the sums set forth in the Final Judgment by those monies actually. Judgment shall be entered against the Guarantors based on the absolute, unconditional guaranties of payment simultaneously with the judgment of foreclosure and judgment against Borrowers and without further, but the judgment against the Guarantors shall include language that the amount of judgment against Guarantors and execution thereon shall be for the total sum of the foreclosure, less the value of the Property as of the date of foreclosure sale as determined by the Court as is set forth in the form of the Final Judgment attached as Exhibit "H" hereto.

Settlement Agreement ¶ 20.

60.     The Acres Defendants asserted additional control by attempting to eliminate Debtors' appeal rights:

> Finality of Judgment. Borrowers and Guarantors hereby consent to the finality of the Final Judgment when entered in the Litigation and waive any right to seek a rehearing or appeal of such Final Judgment.

Settlement Agreement ¶ 21.

61.     On January 30, 2020, the Acres Defendants submitted a judgment for the state court to enter without having provided Kapila with notice of the defaults.

62.     Plaintiff then evaluated whether the interest calculations by the Acres Defendants was wrongful when considering they had not funded the Reserves as required under the governing loan documents.

63.     As of July 3, 2018, the interest accrued for the Acres Defendants loan totaled $6,520,859.38 for the principal allegedly lent totaling $17,149,717.60.

64.     With the amounts identified on July 3, 2018, the interest rate the Acres Defendants charged Debtors is 28%.

65.     As of July 3, 2019, the Acres Defendants had also charged Debtors fees totaling $855,000.00.

66.     When including the fees charged by the Acres Defendants with the interest they charged, the rate is 30%.

67.     The judgment pursued by the Acres Defendants was under the Settlement Agreement and not under the Loan Agreement.

68.     Debtor understood the Settlement Agreement to be a consensual document under which Kapila would complete the Project with the additional funds provided by the Acres Defendants for Lenders', Debtors', creditors', and equity's mutual benefit.

69.     But the Acres Defendants used the Settlement Agreement to oppress Debtors by imposing additional controls, disparaging Mr. Zea, withholding payment to Kapila, withholding payment for professionals retained by Kapila, and leveraging their control to obtain a judgment as they charged forward to foreclose the property.

70.     Plaintiff engaged and paid for Glass Rather's Jim Howard to evaluate whether the Project was feasible under the circumstances by examining several construction budgets and updated appraisals prepared by Integra Realty Resources.

71.     Plaintiff provided the feasibility analysis, construction budgets, and updated appraisals to Kapila.

72.     On June 26, 2020, after receiving the Project information from Plaintiff, Kapila voluntarily resigned as manager and CRO for Debtors.

73.     On June 29, 2020, Debtors commenced the bankruptcy cases.

74.     Upon learning that Kapila resigned and Debtors filed the bankruptcy petitions, the Acres Defendants revealed their true intent and purpose underlying the Settlement Agreement and the Project in several court documents.

75.     In a motion filed in the state court, the Acres Defendants admitted that Kapila as manager and CRO owed the Acres Defendant fiduciary duties, and breached those fiduciary duties when he resigned as manager and CRO.

76.     The Acres Defendants also admitted they intended that Kapila as manager and CRO for Debtors to disregard his duties to Debtors and their stakeholders under the respective operating agreements and Florida Statute Chapter 605.

77.     The Acres Defendants further admitted they entered the Settlement Agreement to ensure that Kapila had no authority to resign without their notice and agreement ignoring the fact there are no covenants or restrictions stated in the Settlement Agreement or operating agreements that prevent Kapila from resigning.

78.     According to the Acres Defendants, they intended the Settlement Agreement to put Kapila in a position that prevented Plaintiff and Debtors from exerting any control over their respective businesses.

79.     The Acres Defendants admitted they intended the Settlement Agreement to withhold from Kapila any authority or discretion, including the authority and discretion to delegate to Debtors or Plaintiff any authority to act for Debtors.

80.     The Acres Defendants have further admitted they would use the Settlement Agreement as a way to prevent Debtors' from filing bankruptcy unless the Acres Defendants first approved it.

81.     The Acres Defendants have admitted they would use the Settlement Agreement to exert sufficient control to prevent Debtors and Plaintiff from amending their respective operating agreements.

82.     The Acres Defendants have admitted they entered the Settlement Agreement to secure control for themselves.

83.     Based on the Acres Defendants admissions, Kapila was unable to represent Debtors' interests during the dispute over the indebtedness.

84.     While the Acres Defendants' pursued the judgment in state court, Kapila took no steps to defend Debtors' interests.

85.     The issues addressed by the state court entering judgment under the Settlement Agreement are not identical to the issues raised under the loan documents within this adversary complaint.

86.     The issues raised in this adversary proceeding under the loan documents were not issues the Acres Defendants litigated in the state court because they obtained a judgment under the Settlement Agreement.

87.     The state court did not make judicial decisions regarding the loan documents essential to the final judgment because the state court entered it without a hearing.

88.     Plaintiff and Debtors did not have a full and fair opportunity to litigate the issues in in the state court because Kapila in fact represented Debtors and excluded Plaintiff while at the same time he was in a conflict of interest – owing duties to Debtors as the sole manager and owing duties to the Acres Defendants as the receiver – which interests were at odds.

89.     Kapila understood that his obligations were to pursue the Project, and stated that there was no further purpose for the receivership, serving as manager, or performing as CRO after the Acres Defendants obtained a judgment in the state court.

### COUNT I
### Breach of Fiduciary Duty – Lender Liability Based on Control

90.     Plaintiff incorporates by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim for breach of fiduciary duty asserting a lender liability arising from control over Debtors.

91.     The Acres Defendants imposed restraints on and exerted control over Debtors by,
*inter alia*, the following:

a.      Bars against encumbering assets, paying dividends, and making capital improvements other than the construction.

b.      The Acres Defendants' security interest encumbered all Debtors' assets.

c.      The Acres Defendants exerted control over Debtors' membership interest, including seeking to keep a right to vote that interest for its own benefit to Debtors' detriment.

d.      Debtors' total financial dependence relied on the Acres Defendants.

e.      The Acres Defendants role was the sole source for loans to Debtors and prohibited Debtors from obtaining loans elsewhere or encumbering its assets.

f.      The Acres Defendants' influenced Debtors' daily operations.

g.      The Acres Defendants installed in Debtors its agent Kapila as receiver, manager, and CRO to run daily operations eliminating Debtors' power over decisions.

h.      The Acres Defendants insisted Debtors' accept day-to-day control by Kapila.

i.      The Acres Defendants controlled Debtors' disbursements and determined when and if to pay Kapila.

92.     The Acres Defendants used coercive power to ensure that Debtors did what lender wanted.

93.    The special relationship between the Acres Defendants and Debtors arising from their control over Debtors' management and operations created a fiduciary relationship with Debtors.

94.    The Acres Defendants imposed control measures to enhance their position at the expense of Debtors' creditors, or to permit The Acres Defendants to be repaid at the other creditors' expense.

95.    The Acres Defendants' judicial admissions in the Court file in the Main Case demonstrate they used Kapila to serve as Debtors' manager and CRO to create duties owed to the Acres Defendants preserving control over Debtors for themselves.

96.    The Acres Defendants' control therefore ensured that they could foreclose Debtors' property based on the judgment to secure an asset worth in excess of $50,000,000 in exchange for having loaned a principal sum totaling less than $15,000,000 without Debtors' ability to independently defend themselves and their assets.

97.    The Acres Defendants' have therefore caused Debtors harm by breaching their fiduciary duty and obtaining a judgment.

Wherefore, the plaintiff, Pinnacle Asset Trust, LLC derivatively on behalf of the debtors The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC for damages joint and several in an amount to be determined at trial, recover all reasonable attorneys' fees and costs under the governing documents giving rise to the claim, and such further relief as the Court deems just and proper.

## COUNT II
### Usury – Lender Liability Based on Failure to Fund Reserves

98. Plaintiff incorporates by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim for usury arising from the Acres Defendants' failure to fund the Reserve.

99. The Acres Defendants extended credit to Debtors, willfully and knowingly charged, took, or receive interest at a rate exceeding 25% per annum from Debtors directly or indirectly.

100. The Acres Defendants violated Florida's usury statutes.

101. Debtors having suffered injury by the Acres Defendants' violation of Florida's usury statutes may bring an action to recover damages, which includes all actual damages not less than the amount included in the judgment, plus reasonable attorney's fees and costs.

102. The Acres Defendants are also liable to Debtors for punitive damages.

Wherefore, the plaintiff, Pinnacle Asset Trust, LLC derivatively on behalf of the debtors The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC for damages joint and several in an amount to be determined at trial, award Plaintiff punitive damages, all reasonable attorneys' fees and costs under the governing documents giving rise to the claim, and such further relief as the Court deems just and proper.

## COUNT III
### Fraudulent Transfer
### Constructive Fraud 11 USC §548

103. Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim to avoid the final judgment as a constructive fraudulent transfer.

104. This is an action under 11 U.S.C. §§ 548 and 550 to recover from the Acres Defendants for a fraudulent transfer.

105.    Within 2 years before the filing of the petition in this case, Debtors transferred to the Acres Defendants the rights to enter final judgment under the Settlement Agreement.

106.    At all times relevant to the claim, Debtors had creditors, including without limitation, Ardent Insurance, Bogza Inc., Comcast Business, Dow Jones/Wall St. Journal, JW Craft, Inc., Old Cove Condominium of Naples, RGA Design Forensics, Robb Report, Stoft Cooney Architects, Williams Scotsman, and Frost Metal Framing & Drywall Inc.

107.    Debtors received less than a reasonably equivalent value in exchange for the final judgment under the Settlement Agreement, and Debtors engaged or were about to engage in a transaction for which Debtors' remaining assets were unreasonably small in relation to the transactions or were rendered insolvent due to Acres submission of the judgment and refusal to fund construction of the Project, which would have maintained Debtors solvency.

108.    These actions resulted in the lien held by the Acres Defendants substantially increasing beyond its true value without reasonably equivalent value in exchange for the forgoing.

Wherefore, the plaintiff, Pinnacle Asset Trust, LLC derivatively on behalf of the debtors The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC avoiding the judgment as a constructive fraudulent transfer, and award such further relief as the Court deems just and proper.

### COUNT IV
### Fraudulent Transfer
### Constructive Fraud under Florida Statute § 726.105(1)(b)(1)

109.    Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim to avoid the final judgment as a constructive fraudulent transfer.

110.    This is an action under 11 U.S.C. § 544 and Florida Statute section 726.105(1)(b)(1) to recover from the Acres Defendants.

111.    Within 4 years before the filing of the petition in this case, Debtors transferred to the Acres Defendants the rights to enter final judgment under the Settlement Agreement.

112.    At all times relevant to the claim, Debtors had creditors, including without limitation, Ardent Insurance, Bogza Inc., Comcast Business, Dow Jones/Wall St. Journal, JW Craft, Inc., Old Cove Condominium of Naples, RGA Design Forensics, Robb Report, Stoft Cooney Architects, Williams Scotsman, and Frost Metal Framing & Drywall Inc.

113.    Debtors received less than a reasonably equivalent value in exchange for the final judgment under the Settlement Agreement, and Debtors engaged or were about to engage in a transaction for which Debtors' remaining assets were unreasonably small in relation to the transactions or were rendered insolvent due to Acres submission of the judgment and refusal to fund construction of the Project, which would have maintained Debtors solvency.

114.    These actions resulted in the lien held by the Acres Defendants substantially increasing beyond its true value without reasonably equivalent value in exchange for the forgoing.

Wherefore, the debtors, The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC avoiding the judgment as a constructive fraudulent transfer, and awarding such further relief as the Court deems just and proper.

### COUNT V
### Preference
### Preference 11 USC §547

115.    Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim to avoid the final judgment as a preference.

116.    Debtors seek to avoid the judgment because it constitutes a transfer of an interest of Debtors property made to or for the benefit of the Acres Defendants, for or on account of an antecedent debt owed by Debtors, transferred while Debtors were insolvent.

117.    Debtors had been rendered insolvent by the actions of the Acres Defendants, including but not limited to their refusal to maintain the value of the Project by funding construction.

118.    The transfer was on or within 90 days before the petition date; or between ninety days and one year before the petition date considering the Acres Defendants are insiders based on their control over Debtors, which enabled the Acres Defendants to receive more than they would receive if the case were a case under chapter 7 of this title, the transfer had not been made, and the Acres Defendants will receive payment of such debt to the extent provided by the provisions of this title.

Wherefore, the debtors, The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC avoiding the judgment as a preference, and awarding such further relief as the Court deems just and proper.

### COUNT VI
### Equitable Subordination

119.    Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim to avoid the final judgment as a preference.

120.    The Acres Defendants engaged in inequitable conduct including the following:

   a.    The Acres Defendants imposed restraints on Debtors, including bars against encumbering assets, paying dividends, and making capital improvements other than the construction.

   b.    The Acres Defendants' security interest encumbered all Debtors' assets.

22

c.   The Acres Defendants controlled Debtors' membership interest with the authority to vote that interest.

d.   Debtors' total financial dependence relied on the Acres Defendants.

e.   The Acres Defendants role was the sole source for loans to Debtors and prohibited Debtors from obtaining loans elsewhere or encumbering its assets.

f.   The Acres Defendants' influenced Debtors' daily operations.

g.   The Acres Defendants installed in Debtors its agent Kapila as receiver, manager, and CRO to run daily operations eliminating Debtors' power over decisions.

h.   The Acres Defendants insisted Debtors' accept day-to-day control by Kapila.

i.   The Acres Defendants controlled Debtors' disbursements and determined when and if to pay Kapila.

j.   The Acres Defendants used coercive power to ensure that Debtors did what Lenders wanted.

k.   The Acres Defendants' exerted sufficient control over Debtors to have owed a fiduciary duty – the Acres Defendants controlled the lender and the borrowers in the loan relationship between Lenders and Debtors– making decisions for both sides.

l.   The Acres Defendants imposed control measures to enhance their position at the expense of Debtors' creditors, or to permit The Acres Defendants to be repaid at the other creditors' expense.

121.    The Acres Defendants' judicial admissions in the Court file in the Main Case show that they insisted Kapila serve as Debtors' manager and CRO owing his duties to the Acres Defendants and preserving control over Debtors for themselves.

122.    The Acres Defendants' control – so much so they dominated Debtors' free will – therefore as an insider ensured that they could foreclose Debtors' property based on the judgment to secure an asset worth in excess of $50,000,000 in exchange for having loaned a principal sum totaling less than half that amount.

123.    The Acres Defendants' conduct has injured other creditors or afforded the Acres Defendants an unfair advantage.

124.    Subordinating the Acres Defendants claim is not otherwise inconsistent with the Bankruptcy Code.

125.    Due to the inequitable conduct, the Court has the authority and should assign the subordinated portion of the Acres Defendants' lien to the Debtors' estate.

Wherefore, the debtors, The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC equitably subordinating such portion of its purported debt that is inequitable and punitive towards the Debtors and their creditors, assign the Acres Defendants' lien to the estate for the portion of the Acres Defendants' claim that is subordinated, and award such further relief as the Court deems just and proper.

### COUNT VII
### Fraud

126.    Plaintiff and Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim damages caused by the Acres Defendants' fraud related to the Settlement Agreement.

127. The Acres Defendants' covenants, representations, and statements in the Settlement Agreement asserting that they intended to complete the Project using Kapila's neutral and fiduciary services was false when the Acres Defendants made them.

128. The Acres Defendants' knew their covenants, representations, and statements in the Settlement Agreement asserting that they intended to complete the Project using Kapila's neutral and fiduciary services was false when the Acres Defendants made them.

129. The terms, representations, and assertions stated in the Settlement Agreement were false or fraudulent at the time the Acres Defendants made them as shown by the admissions contained in the submissions they filed with the state court and reflected in the Court's file in the Main Case.

130. The Acres Defendants' made the false covenants, representations, and statements in the Settlement Agreement intending Plaintiff and Debtors to rely on them.

131. Plaintiff and Debtors relied on the Acres Defendants' false covenants, representations, and statements in the Settlement Agreement.

132. Plaintiff and Debtors suffered harm caused by relying on the Acres Defendants' false statements.

Wherefore, the plaintiff, Pinnacle Asset Trust, LLC and the debtors, The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston Casualty Company, and Acres Capital, LLC for damages joint and several in an amount to be determined at trial, recover all reasonable attorneys' fees and costs under the governing documents giving rise to the claim, and such further relief as the Court deems just and proper.

### COUNT VIII
### Fraud in the Factum

133.     Plaintiff and Debtors incorporate by reference the facts alleged in paragraphs 1 through 89 as though fully stated in this claim to avoid the Settlement Agreement and judgment due to the Acres Defendants' fraud in the factum.

134.     The Acres Defendants' covenants, representations, and statements in the Settlement Agreement asserting that they intended to complete the Project using Kapila's neutral and fiduciary services was false when the Acres Defendants made them.

135.     The Acres Defendants' knew their covenants, representations, and statements in the Settlement Agreement asserting that they intended to complete the Project using Kapila's neutral and fiduciary services was false when the Acres Defendants made them.

136.     The terms, representations, and assertions stated in the Settlement Agreement were false or fraudulent at the time the Acres Defendants made them as shown by the admissions contained in the submissions they filed with the state court and reflected in the Court's file in the Main Case.

137.     The Acres Defendants' made the false covenants, representations, and statements to induce Plaintiff and Debtors to sign the Settlement Agreement.

138.     Plaintiff and Debtors did not have knowledge the Acres Defendants' made the false covenants, representations, and statements to induce Plaintiff and Debtors to sign the Settlement Agreement.

139.     Plaintiff and Debtors did not have a reasonable opportunity to learn the character of the Acres Defendants essential terms to control Kapila as manager and CRO.

Wherefore, the plaintiff, Pinnacle Asset Trust, LLC and the debtors, The Bay Club of Naples, LLC and The Bay Club of Naples II, LLC, demand judgment against the defendants, Reliance Standard Life Insurance Company, U.S. Specialty Insurance Company, Houston

Casualty Company, and Acres Capital, LLC to grant all equitable relief available for judgment on fraud in the factum, and such further relief as the Court deems just and proper.

Dated July 24, 2020.

BECKER & POLIAKOFF, P.A.
1 East Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone : (954) 364-6037
Fax : (954) 985-4176
Jpolenberg@beckerlawyers.com
Dgoldman@beckerlawyers.com
Tfritz@beckerlawyers.com
Nsantiago@beckerlawyers.com

_____

Jon Polenberg, Esq.
Florida Bar No. 653306
Darren M. Goldman, Esq.
Florida Bar No. 88638

ACTIVE 13984095v.2